Filed 8/25/20  In re Valerie G. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION THREE

| | |
|---|---|
| In re VALERIE G. et al., Persons Coming Under the Juvenile Court Law. | B304592 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MARIA G., Defendant and Appellant. | Los Angeles County Super. Ct. Nos. 18CCJP00962 B & C |

APPEAL from an order of the Superior Court of Los Angeles County, Philip L. Soto, Judge. Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Maria G. (mother) appeals from the court's order at the six-month review hearing continuing the out-of-home placement of her two children, Mark and Valerie. Mother contends: (1) insufficient evidence supports the court's finding that returning the children to her custody would create a substantial risk of detriment to their safety or well-being; (2) insufficient evidence supports the court's finding that the Department of Children and Family Services (Department) provided mother reasonable reunification services; and (3) the court abused its discretion when it awarded mother only monitored visitation. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.  The Initiation of Dependency Proceedings

Mother has three children who are the subjects of the underlying dependency proceedings: Mark (born in 2005), Valerie (born in 2004), and Melissa (born in 2001).[1] At the time the family came to the Department's attention, Mark was receiving treatment for attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder, and oppositional defiant disorder, and Valerie was receiving treatment for major depressive disorder with general anxiety.

In January 2018, the Department received a referral alleging mother's then 51-year-old boyfriend, Martin L., had sexually abused Valerie and Melissa. Martin touched Melissa's breasts and buttocks and would often squeeze her "too tight"

---

[1] Melissa, who is now older than 18, is no longer part of the proceedings because the court terminated jurisdiction over her when she reached the age of majority.

when giving her a hug. He also kissed Valerie on the neck and rubbed her arms in a manner that made her uncomfortable.

Mother denied ever seeing Martin act inappropriately around the children, and she told the Department she didn't have any concerns about the children's safety around him. The children's maternal grandmother, however, claimed that mother was aware that Martin inappropriately touched her daughters, and both the grandmother and Valerie reported that mother would get "jealous" when Martin touched the girls. According to the grandmother, mother would "beat" the girls because of Martin's behavior.

The family also reported that mother struck the children on several occasions. Mother would push Mark "hard in the stomach and chest" to discipline him. During one incident, she yelled at Mark and scratched his face, causing it to bleed, after he got into a fight with Melissa. Mother would pull Melissa's hair and slap her face, and she once punched Melissa in the stomach. Mother also pulled Valerie's hair and slapped her face after she "tried to stand up for Melissa."

In February 2018, the Department filed a dependency petition under Welfare and Institutions Code[2] section 300 on behalf of Valerie, Mark, and Melissa, alleging: (1) mother physically abused the children by striking them with her hands (a-1, a-2, a-3, b-1, b-2, b-3, j-1, j-2, j-3 allegations); and (2) Martin sexually abused Valerie and Melissa by inappropriately touching and kissing them (b-4, b-5, d-1, d-2, j-4, j-5 allegations). At the initial hearing on the petition, the court ordered Martin to stay at

[2] All undesignated statutory references are to the Welfare and Institutions Code.

least 100 yards from the children and to have no contact with them and mother. The court also directed mother to abide by the no contact order and to ensure that Martin did not come near the children or the family's home. The court ordered the children released to mother's custody.

## 2. Jurisdiction and Disposition

In April 2018, mother reported that Martin no longer lived in the home or had any contact with the children. Mother continued to deny that Martin ever sexually abused Valerie and Melissa, but she told the social worker she would ensure Martin continued to have no contact with the children.

In mid-April 2018, Valerie and Mark were both hospitalized and placed on psychiatric holds. In Valerie's case, the child had threatened to kill herself. Valerie was "reportedly poking herself with a knife" and asking a friend to "get a gun so she could shoot herself." Valerie had told mother that she didn't have a purpose in life and felt she was overweight. In Mark's case, he was hospitalized after exhibiting "aggressive" and "sexualized" behavior. Mark told his therapist that his behavior "escalated" after his psychiatrist changed his medication and Martin was removed from the family's home.

Valerie was hospitalized a second time in May 2018 after she picked up a knife in front of mother and said, "I just want to stab myself." Valerie had become angry after she overheard mother speaking to a school counselor about enrolling Valerie in support services.

In May 2018, the court dismissed the allegations that mother had physically abused Mark (a-1, b-1 allegations), as well as two of the allegations concerning Martin's sexual abuse (j-4 and j-5 allegations). The court amended and sustained the

4

remaining allegations. With respect to the allegations concerning mother's physical abuse of Valerie and Melissa, the court struck the language that mother had abused the children and replaced it with language that mother had inappropriately disciplined them (a-2, a-3, b-2, b-3, j-2, j-3). The court also struck Mark's name from the sustained allegations concerning Martin's sexual abuse of Valerie and Melissa (b-4, b-5, d-1, d-2 allegations).

The court declared the children dependents of the court and released them to mother's custody. The court ordered mother to attend joint counseling with the children once the children's therapists agreed they were ready to participate. The court also ordered mother to participate in sexual abuse awareness counseling, as well as counseling to address "child protection," "proper child discipline," and "past sexual abuse trauma." The court ordered Martin not to have any contact with the children or to live in the family's home.

3.    **The First Supplemental Petition**

In September 2018, Valerie was hospitalized after expressing suicidal ideations. She had threatened to drink bleach because she was upset with how mother and Mark treated her. Valerie reported that Mark sexually harassed her, and mother continued to be physically abusive. According to Valerie, Mark would touch her " 'in inappropriate places' " and tell her to take her clothes off. Valerie reported that mother ignored her complaints about Mark's behavior.

In early October 2018, Valerie's therapist at St. Anne's, a wraparound therapy program, reported that Valerie was actively participating in therapy, but mother was "resistant to participate in collaterals with Wraparound Team Members." Mother's "parent partner" at St. Anne's also reported that mother refused

to meet for the past few months and was resistant to participating in therapy services with Valerie. The parent partner reached out to mother every week, but mother did not "make herself available." According to the parent partner, it was difficult to schedule meetings because mother refused to meet any time other than Monday mornings, and mother wanted all the family's service providers to schedule meetings on that day.

A representative from "AVIVA," where Mark was receiving wraparound therapy, reported that mother had been meeting with her AVIVA parent partner once a week. Mother was "doing well" in Mark's program.

Mother told the Department's social worker that meeting with her parent partners was " 'useless' " because it took away from "her time," and she believed the parent partners didn't provide much support. Although mother wanted her children to continue to participate in therapy, she did not want to continue because she felt " 'pressured' " to do so, which made the services "not effective." Mother wanted to do services on her own time and at her own pace and "not feel obligated to complete them."

Mother was, however, participating in parenting classes and individual therapy. A representative from mother's parenting program reported that mother had been participating for the past four weeks and had missed only one session. Mother was participating "a lot," talking about her "experiences," and open to "suggestions and advice."

Mother's therapist reported that mother had been attending therapy on a weekly basis since late August 2018. According to the therapist, mother has good insight and cares a lot about the children. The therapist needed to work on "psycho-educating" mother about what she can do to prevent case issues

from arising in the future and to show that she is able to protect the children.

In mid-October 2018, the Department removed the children from mother's custody after one of the family's neighbors reported that Martin was still living in the family's home. One of the Department's social workers had also seen Martin loading construction equipment into his truck from a garage in the same apartment complex where the family lived. The family denied Martin still lived in the home or had any recent contact with the children, and mother continued to deny that Martin had ever acted inappropriately toward Valerie and Melissa. Martin also denied contacting the family and claimed he was only renting a garage in the family's apartment complex.

In late October 2018, the Department filed a supplemental petition under section 387, alleging mother failed to protect the children's safety because she continued to allow Martin to live in and frequent the family's home in violation of the court's no contact order. The court struck the language that mother continued to allow Martin to live in the family's home and sustained the supplemental petition as amended. The court ordered the children to remain detained from mother's custody and awarded her monitored visitation.

In mid-November 2018, at a pre-disposition hearing, the court returned the children to mother's custody "contingent on mother continuing to comply with court ordered services and allowing service providers to work with the family in the home." The court ordered mother and the children not to have any contact with Martin.

In late November 2018, the family moved into a new home. Shortly after moving, Valerie was hospitalized after threatening

to kill herself with a knife. Valerie told the Department she had not taken her medication before she threatened to kill herself.

The court held the disposition hearing on the first supplemental petition in December 2018. The court allowed the children to remain in mother's custody. The court directed mother not to leave Valerie alone without adult supervision and to ensure the child took all prescribed medication. The court also ordered Martin to have no contact with the children. As part of her court-ordered case plan, the court required mother to participate in conjoint counseling with the children, to attend parenting classes focused on sexual abuse awareness, and to attend individual counseling addressing child protection, proper child discipline, and past sexual abuse trauma with a licensed Department-approved therapist.

### 4. The Second Supplemental Petition

Valerie was hospitalized four times between December 2018 and March 2019 after expressing suicidal ideations, and Mark was hospitalized in December 2019 after he tried to choke Melissa. Valerie continued to actively participate in wraparound services, focusing on increasing positive interactions with family members, utilizing healthy coping skills, and reducing isolative behavior.

In March 2019, the Department received a referral that Mark had sexually abused Valerie. Although the Department deemed the referral inconclusive, Mark's therapist was concerned about the child's "sexual behaviors." According to the therapist, Mark often makes "sexual noises" and uses inappropriate sexual phrases. The therapist was worried about Mark continuing to live with his female siblings, and he stressed that the child should never be left alone with "any female other than mother."

In late March 2019, the court terminated jurisdiction over Melissa.

In April 2019, mother left Valerie home alone with Mark and Melissa. While mother was gone, Valerie cut herself multiple times with a razorblade and had to be taken to the hospital. Valerie later reported that mother was visiting Martin when the child cut herself. According to Valerie, mother had been seeing Martin since November 2018, and he took the family to church every Sunday. Mother would also take the children to visit Martin's family members. Valerie told the Department that she feels uncomfortable being around Martin.

In early May 2019, the Department's social worker interviewed the family. Mother and Mark claimed Martin no longer saw mother or had any contact with the children. Valerie initially stated that she lied about mother leaving the children alone to visit Martin, claiming she wasn't on her medication at the time she made the report. However, when the social worker told the child that she had agreed to tell the truth, Valerie confirmed that mother was still seeing Martin. According to Valerie, "mother never stopped seeing [him]. He never left being around [the family]." Valerie had "seen Martin a lot of times and every Sunday when he comes to church." Mother would visit Martin on Saturdays and talk to him on the phone every day. According to Valerie, mother told the child to lie to the social worker about mother's relationship with Martin. Mother told Valerie that "no one will stop [mother] from being with Martin." Valerie ended the interview because she was afraid mother would ask her what she talked about with the social worker.

The social worker interviewed St. Anne's Wraparound Facilitator, who reported that Valerie is " 'honest' " with the

program's staff. Valerie told the staff that mother still sees Martin and talks to him daily, and that the family sees him every Sunday at church. According to Valerie, mother would leave the children with their adult brother, William, when she stays with Martin overnight.

William confirmed that mother was still dating Martin. Martin didn't come to the family's home, but mother would see him at night and return home around 6:00 a.m. in the morning to take the children to school. When asked who supervised Valerie and Mark while mother was gone, William replied, "I'm not sure[.] [H]owever, Melissa and I were at home. [Mother] never asked either one of us specifically to care for the children."

William confirmed that mother would instruct the children to lie to the Department's social workers about her relationship with Martin. According to William, "mother manipulates the kids to be silent about [Martin]."

According to Mark's therapist, mother has been "responsive" to Mark's needs, and she cooperates with treatment requests and "implement[s] treatment interventions." But mother struggles to provide "certain pertinent details of [Mark's] history," has cancelled treatment appointments, and needs reminders to follow through with obtaining Mark's medical records.

In early June 2019, the Department removed Mark and Valerie from mother's custody and filed a second supplemental petition on their behalf. The petition alleged mother endangered the children by continuing to allow Martin around the family and instructing Valerie to lie about mother's ongoing relationship with him.

After filing the second supplemental petition, the social worker interviewed the family. Valerie reported that living with mother was "pretty miserable." Valerie and mother had trouble communicating, and mother often said "horrible" things about Valerie. Valerie told the social worker she didn't want to return home, explaining: " 'At home I'd cut myself and I wouldn't shower for days because I was so fucking depressed. I didn't care. My mom, all she does is call me crazy and she never acknowledges my feelings. All she does is talk shit about me.' " Mother would scream at Valerie, saying " 'look at you. You disgust me. You're disgusting. You're a mistake. I can't even look at you. I hope you tell them you don't want to live with me so you can live somewhere else.' "

Mark was recalcitrant during his interview. When asked if mother leaves him and Valerie home alone, he replied, " 'I don't know. I was asleep. How am I supposed to know what she does when I'm sleeping? … [¶] I don't have to talk to you. I have that right. I don't have to answer your stupid questions. Talk to the other social workers.' " Mark believed Valerie was the cause of the family's problems. According to him, mother is "always there" for the children, but Valerie starts fights with mother and calls Mark names.

Mother told the social worker she was no longer seeing Martin. She claimed Valerie lied about their ongoing relationship because the child says " 'things to hurt [the] family.' " Mother admitted that she provided Valerie the razor that the child used to cut herself in April 2019. Mother explained, " '[Valerie] was nagging and complaining for a razor; she wanted to shave her arms and armpits. So I gave her one.' "

William reported that mother "monitors" Melissa's phone calls and has trained Melissa, Valerie, and Mark to lie to the police and the Department. Mother bribes the children with "clothes, skin care, taking Valerie to get her nails done, video games for Mark." Mother bribes Mark the most because he sides with her more often than the other children. According to William, mother blames Melissa for bringing the family to the Department's attention because "Melissa was asking for it" and "trying to steal [mother's] boyfriend."

Valerie's therapist reported that the child's mood had improved significantly since she was removed from mother's custody. Before she was removed from mother's home, Valerie would have "suicidal ideation[s] daily" and was frequently hospitalized. Valerie had gone nearly three months since her last hospitalization. The therapist believed mother was encouraging Valerie to lie during therapy sessions.

Staff at St. Anne's reported that mother is not "open" and lacks insight about the children's sexual abuse. According to the program's facilitator, mother doesn't believe Martin sexually abused her children because he never "penetrated" Valerie or Melissa. The facilitator and mother's parent partner also reported that mother was no longer seeing a therapist because she didn't think she needed one. St. Anne's parent partner has tried to "link mother to services," but mother refused because " 'she doesn't need it.' "

In late June 2019, Valerie ran away from her group home. The police took Valerie to where her adult sister, Lesly, worked. Mother picked Valerie up and drove her to the hospital. On the way to the hospital, after mother yelled and cursed at Valerie, the child tried to jump out of mother's car. Mother grabbed

Valerie by the arm, causing it to bruise. After Valerie refused to return to the group home she ran away from, she was placed in a new home.

Prior to the adjudication hearing on the second supplemental petition, mother submitted certificates confirming she completed two courses: one focused on family communication skills and another focused on coping with sexual violence. Mark and Valerie had also completed the course focused on family communication skills.

In July 2019, the court sustained the second supplemental petition. The court ordered Valerie and Mark to remain placed out of mother's custody. The court ordered mother to participate in conjoint counseling with Valerie and Mark upon the approval of the children's therapists. The court also ordered mother to participate in parenting classes focused on sexual abuse awareness and individual counseling focused on child protection, appropriate child discipline, past sexual abuse trauma, and co-dependency issues. The court awarded mother monitored visitation with the children and again ordered Martin not to have any contact with the children.

## 5.   The Reunification Period

In October 2019, mother went to Valerie's school without permission. The school provided mother and Valerie a private room and left them unattended for half an hour. Mother also gave Valerie a cell phone when she moved into a foster home.

The foster mother reported that Valerie's behavior is controllable when she doesn't interact with mother, but the child often becomes upset and acts out after she speaks to mother on the phone. Mother once called Valerie to tell the child that she's "stupid, retarded [and] not safe." Mother also told Valerie that

13

mother's actions had nothing to do with Valerie being removed from mother's custody. Valerie reported that she started running away from school because of mother's "upsetting" phone calls. Mother also threatens and yells at the foster mother and tells Valerie not to listen to her.

An "FFA worker [reported that mother] 'is being very difficult in trying to control what goes on in [Valerie's] foster home. … Mom told foster mom she knows where she lives, is telling her to take down all Halloween decorations because Valerie shouldn't be celebrating Halloween, and was speaking poorly of Valerie calling her retarded, mental, etc.' " The FFA worker recommended that someone advise mother to try to keep her interactions during visits with Valerie positive.

In November 2019, Valerie's therapist reported that recent conjoint counseling sessions with mother and Valerie had not gone well. During a session in September, mother and Valerie argued over who was to blame for Valerie being placed out of mother's custody. During a subsequent session, Valerie became upset because mother continued to refuse to accept responsibility for Valerie having to live in a group home. In October, Valerie refused to participate in any more therapy sessions with mother. According to the therapist, Valerie "was not ready and needs a lot of therapy."

Mark was struggling in his group home and conjoint counseling. He would fidget and become impatient during counseling sessions because he wanted to "play." At his group home, Mark often would leave without permission, engage in sexualized behavior, and get into physical altercations. During a monitored phone call, mother made inappropriate comments to Mark, telling him about her problems "as if he was her peer" and

14

complaining that Valerie was mad at her. Mark later called Valerie and told her, " 'Don't fucking be like that with mom!' "

According to the Department, mother was participating in individual counseling to address child abuse, proper child discipline, past sex abuse trauma, and codependency with a licensed therapist. But mother continued to show a lack of insight about Martin's sexual abuse of Valerie and Melissa. She told the social worker that she didn't "consider Martin's behavior sexual abuse." According to mother, "Valerie was not sexually abused and there was only a onetime accident."

Mother regularly attended visits with Mark and Valerie. The Department recommended that mother continue to have only monitored visits because of her "ongoing volatile and erratic behavior," including "unmonitored clandestine meetings" during which she tried to sabotage Valerie's placement.

### 6.    The Six-Month Review Hearing

The court held a contested six-month review hearing in late January 2020. Mother submitted a progress report that her therapist drafted earlier that month. Mother had completed 17 individual therapy sessions, during which she was "actively engaged" and "cooperative." She "presented her motivations and willingness to meet her treatment goals, reducing her anxiety and implementing effective coping skills." Mother also demonstrated "insight and understanding" of how she can better protect her children and use proper forms of discipline. Mother was still working on "processing her feelings and thoughts about past trauma and co-dependency issues." Mother also completed a two-hour sexual assault awareness class and a 10-week comprehensive parenting class.

15

Mother and one of the Department's social workers testified. Mother denied having any contact with Martin for over a year. She claimed she accepted responsibility for the children becoming dependents of the court, and she denied being "overbearing" with the staff members of the children's wraparound programs.

The social worker testified that mother has been participating in her court-ordered classes and counseling. Mark and mother have been participating in conjoint counseling, and the Department is trying to reinstitute conjoint counseling between Valerie and mother. Despite mother's participation in classes and counseling, the social worker was concerned that mother still lacks insight into, and has yet to resolve, the issues that brought the children to the court's attention. According to the social worker, mother continues to deny that Martin has had contact with the family throughout the dependency proceedings, and she refuses to accept responsibility for her conduct, continuing to blame the children for bringing the family to the court's attention.

The social worker opined that it would be detrimental to Mark's and Valerie's safety and well-being to return to mother's custody. In Mark's case, mother's lack of insight into the issues that brought the children to the court's attention creates a risk of harm if Mark were to return home.

In Valerie's case, the child still has unresolved mental health issues that are exacerbated when she lives with mother. The child was hospitalized on nearly a monthly basis while living with mother, but her behavior has stabilized since being placed in a group home. The social worker believed there was a risk that Valerie would be re-hospitalized if she returned to mother's

16

custody. Although Valerie acts out and has had to change foster homes since being removed from mother's custody, mother is often the reason Valerie acts out.

The Department requested the court continue the children's out-of-home placement and mother's monitored visitation. Mother, Mark, and Valerie asked the court to return the children to mother's custody or, at a minimum, to award mother unmonitored visits.

The court found by a preponderance of the evidence that returning the children to mother's custody would create a substantial risk of detriment to their safety and well-being and ordered them to remain placed out of mother's custody. The court also found the Department had provided mother reasonable reunification services, and that mother had made partial progress in completing her court-ordered case plan. The court ordered the Department to continue providing mother reunification services and monitored visits with the children.

Mother appeals.

## DISCUSSION

1. **Substantial evidence supports the court's detriment finding.**

Mother contends the court erred in continuing Valerie's and Mark's out-of-home placement because insufficient evidence supports the finding that returning the children to her custody would be detrimental to their safety and well-being. As we explain, substantial evidence supports the court's detriment finding.

At the six-month review hearing, the court must return the children to their parent "unless the court finds, by a

17

preponderance of the evidence, that the return of the child[ren] to [their] parent … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child[ren]." (§ 366.21, subd. (e)(1).) The risk of detriment to support a removal order at a post-disposition review hearing need not be the same type of risk that gave rise to the jurisdiction findings or a prior removal order. (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 900 [out-of-home placement must continue if the child faces a current risk of detriment "regardless of whether that detriment mirrors the harm which had required the child's removal from parental custody"].)

In determining whether it would be detrimental to return the children to their parents' custody, the court may consider the parent's past conduct and the present circumstances. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917 (*Cole C.*).) Specifically, the court may look to several factors, including: (1) the parent's awareness of the children's needs and the problems that gave rise to the dependency proceedings; (2) psychological evaluations addressing whether returning the children to their parent would be detrimental to their well-being; (3) the parent's decision to maintain relationships with people whose presence would be detrimental to the children; (4) the parent's ability to maintain a stable home environment; (5) the parent's progress in court-ordered services; and (6) the manner in which the parent has conducted herself around the children in the past. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704–705.)

We review a finding that it would be detrimental to return the children to their parent's custody at the six-month review hearing for substantial evidence. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483.) We view the evidence in a light most

18

favorable to the prevailing party and indulge all reasonable inferences to uphold the court's ruling. (*Ibid.*) As we explain, nearly all the factors outlined above support the court's detriment finding in this case.

To be sure, mother has participated in court-ordered counseling and parenting classes. But despite making progress in her case plan, mother continues to show an alarming lack of awareness of the problems that brought her children to the court's attention. (See *Cole C.*, *supra*, 174 Cal.App.4th at p. 918 [parent's refusal to accept responsibility for conduct leading to child's dependency supported a finding that there were no reasonable means to protect the child absent removal from the parent's custody].)

For instance, mother demonstrated a complete lack of insight about Martin's sexual abuse throughout the life of this case. Mother repeatedly denied that Martin ever sexually abused Valerie and Melissa, and she continued to deny any abuse occurred as late as October 2019. Mother also minimized Martin's conduct. She blamed Valerie and Melissa for his behavior, claimed any inappropriate touching was only a "onetime accident," and refused to acknowledge any abuse occurred because Martin never penetrated either of the girls.

In addition, mother continued to see Martin and allowed him to have access to the children, even after the court sustained two separate petitions related to his sexual abuse and in violation of the court's no contact orders. Mother would leave the children alone with their siblings while visiting Martin and, on one occasion while she was with Martin, Valerie intentionally cut herself with a razorblade that mother gave her. Mother also tried to hide her relationship with Martin from the court and the

19

Department by coaching her children to lie about it. At a minimum, mother's failure to accept responsibility for the issues giving rise to this case, her denial of Martin's wrongdoing, and her refusal to extricate Martin from her and the children's lives place Valerie and Mark at a substantial risk of harm should they be returned to her custody.

But mother's problems don't stop there. Throughout the life of this case, she has verbally abused Valerie, making derogatory remarks about the child's personality and mental health issues, calling her "retarded," "stupid," and "disgusting." Mother continued to engage in such behavior despite ample evidence, including reports from Valerie's therapists and wraparound staff members, that mother's conduct upset the child and caused her to act out. As a result of mother's abuse, Valerie expressed suicidal thoughts and harmed herself when she lived with mother, acted out and ran away from her group home after she was removed from mother's custody, and refused to participate in conjoint counseling with mother. Indeed, Valerie was hospitalized at least nine times during the nearly 18 months she lived with mother after the Department filed the original petition. By contrast, Valerie was never hospitalized while living outside of mother's custody during the six months leading up to the review hearing.

Mother argues that even if substantial evidence supports the court's detriment finding as to Valerie, the court should have returned Mark to her custody because she and Mark shared a more positive relationship. While it may be true that Mark does not share as volatile of a relationship with mother as Valerie, mother's failure to accept responsibility for any of the underlying case problems and her unresolved behavioral issues continue to create a risk of detriment to Mark's safety and well-being.

By way of example, Mark's therapist reported that the child often engages in inappropriate sexualized behavior and that he should not be allowed around other females unsupervised. Mother's lack of insight into what type of conduct constitutes sexual abuse creates a risk that she won't properly address and control Mark's sexualized behavior. Mother also caused Mark to act out inappropriately toward his group home staff, and she disrupted Mark's and Valerie's relationship by telling him about her own problems and frequently complaining about Valerie's behavior. Moreover, Mark was struggling in conjoint counseling with mother.

Mother claims her testimony at the review hearing and the January 2020 progress report from her therapist show she adequately addressed the issues leading to the children's dependency to justify returning them to her custody. We disagree. As for mother's testimony that she was no longer in a relationship with Martin and had accepted responsibility for bringing the children to the court's attention, it was more than reasonable for the court to discredit those statements based on the totality of mother's conduct. (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216 [reviewing courts defer to the trial courts on issues of witness credibility].) And with respect to the therapist's progress report, it shows at most that mother has made some progress improving her behavior and processing her feelings about past trauma and co-dependency. But as our discussion above makes clear, mother has yet to resolve her behavioral problems that create a risk of harm for the children should they return to her custody. Most importantly, the progress report does not state that mother has accepted responsibility for the issues leading to the children's dependency, nor does it indicate that she

21

has changed her outlook on Martin's behavior or ended her relationship with him.

In short, substantial evidence supports the court's finding that returning Valerie and Mark to mother's custody would create a substantial risk of detriment to the children's safety and well-being.

## 2. The Department offered mother reasonable reunification services.

Mother next contends the Department did not provide her reasonable reunification services because it failed to facilitate conjoint counseling between herself and Valerie.[3] This argument lacks merit.

When the juvenile court orders reunification services, the child welfare agency must provide the family a plan that is tailored to the family's needs and designed to eliminate the circumstances that gave rise to the children becoming dependents of the court. (*Taylor J.*, *supra*, 223 Cal.App.4th at p. 1451.) The agency "must make a good faith effort to develop and implement a family reunification plan. [Citation.] '[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult … .'

---

[3] Mother did not forfeit this argument by failing to object to the reasonable services finding below. (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451 (*Taylor J.*); see also *In re Brian P.* (2002) 99 Cal.App.4th 616, 623 [a parent does not waive argument that insufficient evidence supports the challenged order by failing to object below].)

[Citation.]" (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345.) The agency must also find and maintain contact with service providers and keep the parent informed of whether his or her progress is consistent and compliant with the court-ordered case plan. (*Taylor J.*, at p. 1452.)

The agency's efforts to provide reunification services do not have to be perfect, but they must be reasonable given the circumstances of the case. (*In re T.G.* (2010) 188 Cal.App.4th 687, 697 (*T.G.*).) Services are reasonable if the agency identifies the family's issues, offers a case plan designed to address and eliminate those issues, maintains reasonable contact with the parents, and makes reasonable efforts to assist the parents when compliance with the case plan is difficult. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) We review a finding that the agency provided reasonable reunification services for substantial evidence. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.)

Mother's only challenge to the reasonable services finding is that the Department failed to ensure that she and Valerie participated in conjoint counseling. Mother does not dispute that the Department helped facilitate the conjoint counseling sessions that she and Valerie attended in the fall of 2019. Mother also does not dispute that the Department remained in contact with mother and the therapist conducting the conjoint therapy between mother and Valerie. And Mother concedes that it was her own behavior that caused Valerie to refuse to continue participating in conjoint counseling. Nevertheless, mother insists that "[s]omething further needed to be done to facilitate [her] obtaining this service." Specifically, she argues that the court and the Department failed to put her on notice that her negative behavior toward Valerie and her lack of "insight" could

23

compromise her ability to participate in conjoint counseling. This argument lacks merit.

It is well-established that " ' "[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent. [Citation.]" [Citation.]' [Citations.]" (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233 (*Nolan W.*).) "[T]here is no 'requirement that a social worker take the parent by the hand and escort … her to and through classes or counseling sessions.' " (*Ibid.*, quoting *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.) If a parent "in no way seeks to correct … her own behavior or waits until the impetus of an impending court hearing to attempt to do so, the legislative purpose of providing safe and stable environments for children is not served by forcing the juvenile court to go 'on hold' while the parent makes another stab at compliance." (*Michael S.,* at p. 1463, fn. 5.)

Here, mother was to blame for her lack of progress in conjoint counseling with Valerie. Mother derided Valerie and blamed her for bringing the family to the court's attention throughout the counseling sessions that occurred in September and October 2019, causing the child to refuse to participate in further counseling with mother. Even before mother and Valerie started participating in conjoint counseling, mother was aware that her abusive and agitating behavior upset Valerie and caused her to act out. Thus, mother had adequate notice that she needed to correct her own behavior in order to ensure she could resume conjoint counseling with Valerie. Neither the court nor the Department was required to instruct mother not to engage in such behavior. (See *Nolan W.*, *supra*, 45 Cal.4th at p. 1233.)

Mother's reliance on *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 is misplaced. There, the father complied with his

case plan and "did everything that was asked of him" to regain custody of his infant child, but the child services agency continued to recommend out-of-home placement because he had not obtained adequate housing. (*Id*. at p. 795.) The agency, however, never informed the father that his current housing situation was inadequate, and no part of his case plan required him to find a new home. (*Id*. at pp. 795–796.) Indeed, the house where the father lived appeared to be safe and suitable for an infant. (*Id*. at p. 793.) The appellate court reversed the reasonable services finding because there "was no evidence which would have allowed the court to conclude [the child services agency] had provided [the father] with sufficient assistance to reasonably address its concerns about his housing." (*Id*. at pp. 795–796.)

Unlike in *David B.*, the court in this case never found mother failed to take remedial action that was not required by her court-ordered case plan. Rather, mother simply refused to correct her problematic behavior that, throughout the life of this case, she was aware drove Valerie to engage in disruptive and self-harming behavior. It should have come as no surprise to mother that Valerie would refuse to complete conjoint counseling when mother continued to engage in such behavior during their therapy sessions.

3.    **The court did not abuse its discretion in awarding mother only monitored visitation with the children.**

Finally, mother argues the court abused its discretion when it awarded her only monitored visits with Mark and Valerie. We disagree.

In a dependency proceeding, the juvenile court has the sole power to determine visitation between a parent and the

25

dependent children. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374.) Generally, when children are removed from their parents' custody, the court shall order visitation to be "as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) But the visitation order must be tailored to ensure the children's safety. (*Id.*, subd. (a)(1)(B) ["No visitation order shall jeopardize the safety of the child."].) "We review an order setting visitation terms for abuse of discretion." (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)

Here, the court acted well within its discretion when it maintained monitored visits for mother. As discussed above, mother repeatedly violated the court's orders about not allowing Martin to have any contact with the children, and she has yet to acknowledge that Martin sexually abused Valerie or Melissa. She also coached and bribed Valerie and Mark to lie about her ongoing relationship with Martin. Mother, therefore, failed to show she would keep Martin away from the children if she were allowed to visit them unsupervised. Mother also has yet to show she can ensure Valerie's safety while the child is alone in her care, and mother continued to act inappropriately around the children during the previous period of monitored visitation.

In short, because mother has not shown she can keep the children safe or engage in appropriate behavior around them, the court did not abuse its discretion when it refused to award her unmonitored visitation.

## DISPOSITION

The juvenile court's order issued at the six-month review hearing is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                          LAVIN, J.

WE CONCUR:



EDMON, P. J.



EGERTON, J.